Carney, Circuit Judge, dissenting.
I respectfully dissent.
New York Penal Law ("NYPL") § 260.10(1) provides in relevant part, "A person is guilty of endangering the welfare of a child when: (1) He or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old. ..." The Board of Immigration Appeals ("BIA") has found the far-ranging and vaguely contoured terms of this state misdemeanor child endangerment statute to be categorically equivalent to the similarly ambiguous federal definition of the phrase "crime of child abuse, child neglect, or child abandonment." Under the Immigration and Nationality Act ("INA"), non-citizens convicted of crimes falling under this federal definition are both removable from the United States and absolutely barred from seeking many forms of discretionary relief. 8 U.S.C. § 1227(a)(2)(E)(i) ; itation index="187" url="https://cite.case.law/citations/?q=8%20U.S.C.%20%C2%A7%201227">id. § 1229b(b)(1)(C).
Our court has previously deferred to and affirmed the agency's legal interpretations *624 of the federal statute. See Florez v. Holder , 779 F.3d 207 (2d Cir. 2015). Given the dramatic evolution of the BIA's interpretation of the ambiguous federal law over the past thirty years, from requiring an intentional act involving some "form of cruelty to a child's physical, moral or mental well-being," In re Rodriguez-Rodriguez , 22 I. & N. Dec. 991, 996 (BIA 1999), to requiring only an act that creates a "reasonable probability that the child's life or health will be endangered," Matter of Soram , 25 I. & N. Dec. 378, 385 (BIA 2010), one might question the decision to defer. But I agree with the majority that we are bound by that decision.
Even accepting the BIA's interpretation of the INA, however, the agency's decision to equate New York "child endangerment" law categorically with INA "child abuse"-a decision first set forth in Matter of Mendoza Osorio , 26 I. & N. Dec. 703 (BIA 2016), and now applied to Matthews's case-does not in my view hold under the analysis prescribed by the Supreme Court in Moncrieffe v. Holder , 569 U.S. 184, 133 S.Ct. 1678, 185 L.Ed.2d 727 (2013), and, before that, in Gonzales v. Duenas-Alvarez, 549 U.S. 183, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007). Under these binding Supreme Court precedents, we must assess whether, in applying its criminal law to the "least of the acts criminalized" under the state statute, there is a "realistic probability" that a state could successfully prosecute an individual for conduct that falls outside the federal definition. A review of state trial court opinions and publicly available data reveals that individuals are convicted under New York's child endangerment statute for conduct that, even if richly deserving of criticism, nonetheless falls outside the INA's generic definition of a "crime of child abuse" as conceived of by the BIA.
For example, in New York, individuals have been convicted under § 260.10(1) for leaving a sleeping child unattended in an apartment for at least fifteen minutes, People v. Reyes , 20 Misc.3d 1129A, 872 N.Y.S.2d 692, 2008 WL 3010044 (Crim. Ct. 2008), repeatedly directing vulgar remarks at a toddler, People v. Simmons , 92 N.Y.2d 829, 677 N.Y.S.2d 58, 699 N.E.2d 417 (1998), and possessing marijuana in their residence in proximity to children, People v. Alvarez , 20 Misc.3d 606, 860 N.Y.S.2d 745 (Crim. Ct. 2008). See Guzman v. Holder , 340 F. App'x 679, 682 (2d Cir. 2009) (summary order) (observing that "the New York provision is extraordinarily broad"). Contrary to the expectation expressed in Florez that a conviction under the state statute will be supported by a "sufficiently high risk of harm," 779 F.3d at 212,-a standard that itself floats, unmoored, on the fickle sea of child-rearing conventions-state prosecutions have gone forward and convictions have been secured without evidence of the risk or nature of the harm posed by the ostensibly criminal conduct. See Part I, below. Similarly undercutting the BIA's analysis, the lesser boundaries of the state statute as applied to one significant category of prosecutions are unclear even to the state adjudicators: as New York trial courts have repeatedly commented, "[t]here is no clear consensus among New York cases regarding the sufficiency of an accusatory instrument charging Endangering the Welfare of a Child regarding leaving a child alone at home or in a vehicle." People v. Hot , 58 Misc.3d 1215A, 94 N.Y.S.3d 539, 2018 WL 652480, at *2 (Crim. Ct. 2018).
In my view, these facts, supported by reliable data about how often the state prosecutes the crime and obtains guilty pleas that are punished by non-carceral sentences, take the state crime significantly out of alignment with the INA's definition of child abuse. They demonstrate that, *625 for immigration law purposes, the crimes are not categorically equivalent.
Relying primarily on published New York state appellate decisions, the majority declines to consider the full spectrum of publicly available data and evidence of prosecutions under the statute. But we need not be so restricted: the data and the lower court decisions are largely in the public record, and the texts of those decisions that are nominally "unreported" are nonetheless publicly available. Even if Matthews may not have presented these precise data and court decisions to the BIA, in assessing the "realistic probability" of prosecution under the statute as we apply the categorical approach, our panel may and indeed must consider such public data that reflects the reach of the statute as it is actually applied. These data and decisions paint a picture of prosecutions and guilty pleas showing that the statute's broad and ambiguous language is enforced in a far more expansive, flexible, and subjective fashion than the reported case law might lead one to expect. To overlook this material is to rely on a flawed foundation in concluding that, as prosecuted, New York misdemeanor "child endangerment" is equivalent to the INA's definition of "child abuse."
The results of the equation are troubling: to adopt the BIA's conclusion of categorical equivalence in 2019, and to apply that conclusion retroactively, is to impose consequences on guilty pleas entered years ago that were then unimaginable for a non-citizen defendant. See generally Obeya v. Sessions , 884 F.3d 442 (2d Cir. 2018) ; Lugo v. Holder , 783 F.3d 119 (2d Cir. 2015). To be sure, the charged crime of some who were subject to such prosecutions under § 260.10(1) likely fell in the heartland of the generic INA definition of "child abuse." In such cases, that separation from even one's own children may be the consequence of a guilty plea is no surprise; rather, it is envisioned and may be required by both criminal and family law. But the conclusion seems unavoidable that, for those whose charged endangerment of a child posed more attenuated, limited, or uncertain risks-those whose alleged neglect was leaving a sleeping child home alone briefly, for example; perhaps even for Matthews-the calculus of entering a guilty plea would surely have been significantly altered had the accused parents known that doing so could mean risking the loss of the right to live with their own children in the United States. Although the majority's opinion does not hold that the BIA may apply its ruling retroactively in all cases, today's decision means that those parents will need to live with fear of that new risk.
Aggravating these circumstances yet further, under the INA, individuals convicted of a crime of "child abuse" are categorically ineligible for the cancellation of removal that is otherwise available to non-permanent residents. 8 U.S.C. § 1229b(b)(1)(C). This discretionary form of relief requires the petitioner to show that removal would effect "exceptional and extremely unusual hardship" to a U.S. citizen- or lawful permanent resident- child (or other qualifying relative). Id. § 1229b(b)(1)(D). Today's holding means that some individuals who pleaded guilty to New York misdemeanor endangerment of a child, and who are also able to prove that separation would cause "exceptional and extremely unusual hardship" to that same child, would be unable even to seek discretionary relief. I see no reason to conclude from the INA's language or history that Congress intended that result.
The majority's affirmance of the BIA's erroneous conclusion also opens the door to consequences that are fundamentally at odds with Congress's stated aim in enacting *626 the immigration portions of the Violence Against Women Act ("VAWA"). These authorize immigration courts to provide discretionary relief from removal for individuals who have been "battered or subjected to extreme cruelty" by a U.S. citizen or lawful permanent resident. 8 U.S.C. § 1229b(b)(2)(A)(i). But individuals convicted of a crime falling within the INA definition of "child abuse" are ineligible for cancellation of removal under these "battered spouse or child" provisions. Id. § 1229b(b)(2)(A)(iv). This effect, too, suggests the error of the agency's analysis.
The majority thus errs, in my view, by denying Matthews's petition.
I.
Gerard Matthews became a lawful permanent resident of the United States in 1989, having emigrated to this country from Ireland.[1] A.R. 97. For some period of his residency, he has worked as a carpenter; he has consistently paid his taxes. Id. He has been married to a U.S. citizen since 2001. Id.
In 2016, the BIA entered a removal order against him based primarily on his convictions in 2002 and 2003 under the New York misdemeanor child endangerment statute, NYPL § 260.10(1).[2] As relevant here, § 260.10(1) proscribes a "knowing[ ] act[ ] [done] in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old." For his part, Matthews's unhappy predicate acts were exposing himself on public streets in the proximity of minors, in 2002 and 2003. Matthews, himself a victim of child abuse during his youth in Ireland and who has been convicted of public lewdness on other occasions not involving minors, has sought and undergone treatment for his underlying disorder. A.R. 98-99.
To prevail on his petition for review, Matthews must prove that § 260.10(1) criminalizes conduct falling outside the INA's definition of a "crime of child abuse, child neglect, or child abandonment"-for present purposes, the operative phrase in the INA. 8 U.S.C. § 1227(a)(2)(E)(i).[3] He may do so by demonstrating a "realistic probability ... that the State would apply its statute to conduct that falls outside the generic definition," and pointing to "other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner." Gonzales v. Duenas-Alvarez , 549 U.S. 183, 193, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007). I believe that Matthews has made that showing.
A. Defining the Generic INA Offense
Determining whether NYPL § 260.10(1) criminalizes conduct beyond the generic INA offense of child abuse requires that we first identify that generic definition.
The BIA has not made the task a simple one: its understanding of the "generic offense" has changed significantly over the past two decades. In the late 1990s, the BIA focused on acts of "cruelty" to children, construing the INA phrase to cover *627 "[a]ny form of cruelty to a child's physical, moral or mental well-being." In re Rodriguez-Rodriguez , 22 I. & N. Dec. 991, 996 (1999). In 2008, in Matter of Velazquez-Herrera , 24 I. & N. Dec. 503, 512 (BIA 2008), the agency meaningfully broadened its operative definition in several respects, holding that it covered not only "intentional, knowing, [or] reckless" conduct, but "criminally negligent act[s] or omission[s]" as well.[4] Its 2008 decision appeared to emphasize the sexual mistreatment of children and strongly suggested that some quantum of actual harm or injury to a child was required:
At a minimum, this definition encompasses convictions for offenses involving the infliction on a child of physical harm, even if slight; mental or emotional harm, including acts injurious to morals; sexual abuse, including direct acts of sexual contact, but also including acts that induce (or omissions that permit) a child to engage in prostitution, pornography, or other sexually explicit conduct; as well as any act that involves the use or exploitation of a child as an object of sexual gratification or as a tool in the commission of serious crimes, such as drug trafficking.
Id.
Two years after Velazquez-Herrera was decided, in Matter of Soram , 25 I. & N. Dec. 378 (BIA 2010), the agency announced that the statutory definition that it will apply is not limited to "those [offenses] requiring proof of actual harm or injury to a child," id. at 381 (emphasis added), but includes those in which the conduct created "a reasonable probability that the child's life or health will be endangered," itation index="224" url="https://cite.case.law/citations/?q=25%20I.%20%26%20N.%20Dec.%20378">id. at 384. Five years later, in Florez v. Holder , we accorded Chevron deference to that expansive construction of the INA and held that a state child endangerment statute will be held categorically to match the INA's generic definition if "it requires, as an element of the crime, a sufficiently high risk of harm to a child." 779 F.3d 207, 212 (2d Cir. 2015).
In 2016, in Matter of Mendoza Osorio , 26 I. & N. Dec. 703 (BIA 2016), the BIA acknowledged that some state child endangerment statutes "do not require a sufficiently high risk of a harm to a child to meet the [INA's generic] definition." Id. at 711. As an example, the agency cited a California law criminalizing "conduct that places a child 'in a situation where his or her person or health may be endangered,' " which the Ninth Circuit described as "punish[ing] 'conduct that creates only the bare potential for nonserious harm to a child.' " Id. (quoting Fregozo v. Holder , 576 F.3d 1030, 1038 (9th Cir. 2009) ). Since then, the BIA has not spelled out what level of risk, of what type of harm, will satisfy the generic INA definition.
Even before its decisions in Soram and Mendoza Osorio , we pointed out (albeit in a non-precedential order), that the agency's standards for the level and type of risk required by the INA's generic definition of "child abuse" have been evolving *628 and expanding; its limits remain unclear. Guzman v. Holder , 340 F. App'x 679 (2d Cir. 2009) (summary order); see also Martinez-Cedillo v. Sessions , 896 F.3d 979, 999 (9th Cir. 2018) (Wardlaw, J. , dissenting) (outlining history of BIA's changing position and opining that Board's failure "to define the precise level of risk required" divorces its definition from statutory text and renders its definition "judicially unadministrable and overly vague").[5] Although the definitional task admittedly is not an easy one, the BIA neither articulates the quantum of risk required by the generic crime nor addresses the functional relationship between the gravity of the risk posed and likelihood of the risk's realization: a reasonable person might expect that the lower the harm presented by certain conduct, the higher the likelihood need be of its occurrence to create criminal liability. For example, while it is easy to imagine all kinds of harms, including mortal harm, that could arise from leaving a sleeping four-year-old child alone in an apartment for fifteen minutes while a parent runs to a neighboring store for milk, the likely harm seems minimal: this is a risk that some reasonable and caring parents will run if pressed by circumstances.
What is clear is that the BIA has deemed that the level of risk was adequate in the Colorado statute considered in Soram to meet the generic INA child abuse definition-a "reasonable probability that the child's life or health will be endangered"-but inadequate in the California statute considered in Fregozo -a child's "person or health may be endangered." Recognizing the haziness of this conception, one of our sister Circuits has recently concluded that a conviction under a Pennsylvania child endangerment statute that "merely requires conduct that could threaten a child's welfare " does not amount to a crime of child abuse under the INA's generic definition. Zhi Fei Liao v. Attorney Gen ., 910 F.3d 714, 722 (3d Cir. 2018) (internal quotation marks omitted) (emphasis added).
With this background, I turn briefly to the text of the relevant New York law. As noted above, NYPL § 260.10(1) provides that a defendant is guilty of misdemeanor child endangerment when "[h]e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child." Unlike the California statute at issue in Fregozo , § 260.10(1) by its terms criminalizes only conduct that is "likely" to create a physical, mental, or moral injury. In Florez , the petitioner did not contest the point; accordingly, we assumed without deciding that the New York statute was coextensive with the federal definition, 779 F.3d at 209, and therefore that the risk envisioned as a predicate to criminal liability was "sufficiently high"-a pivotal phrase whose ambiguity is obvious.
Consequently, we must determine whether, as evidenced by actual prosecutions and convictions, we nonetheless discern a "realistic probability" that New York convicts individuals for conduct generating risks of harm of a likelihood or severity below the federal threshold. See Hylton v. Sessions , 897 F.3d 57, 64 (2d Cir. 2018) (realistic probability inquiry necessary where "the elements of the state statute alone do not provide sufficient guidance on its application"). I therefore *629 next address this test, and my objections to the majority's application of it.
B. The Majority's Application of the "Realistic Probability" Test
As the majority observes, the New York Court of Appeals has ruled that a conviction under § 260.10(1) requires that a defendant have acted "with an awareness of the potential for harm," and "that the harm was likely to occur, and not merely possible." People v. Hitchcock , 98 N.Y.2d 586, 590-91, 750 N.Y.S.2d 580, 780 N.E.2d 181 (2002).[6] Matthews and his amici, however, point to numerous New York prosecutions in which the identified risk of harm seems indeed to have been "merely possible." Further, New York courts appear to be divided on the likelihood of harm that the prosecution needs to show to secure a conviction. In my view, these prosecutions and the related convictions demonstrate a "realistic probability" that § 260.10(1), as applied, sweeps more broadly than does the INA's generic definition of a crime of child abuse.
1) The "Home Alone" Cases and N.Y. Court Rulings on Motions to Dismiss for Facial Insufficiency
The main category cited by Matthews and amici is the "home alone" cases-in which a defendant is charged with violating § 260.10(1) for having left a child unattended for some period of time. For example, in People v. Reyes , a defendant was prosecuted for "allegedly leaving her [sleeping] four year old child in an apartment, unsupervised, for at least fifteen minutes." 20 Misc.3d 1129A, 872 N.Y.S.2d 692, 2008 WL 3010044 at *1 (Crim. Ct. 2008). The defendant moved to dismiss the complaint as facially insufficient as a matter of law, arguing that it did not "allege facts sufficient to provide reasonable cause to believe that the defendant committed the offense charged." Id. at *2. The trial court disagreed, expressing the view that "[i]t is reasonable to imagine the wide range of harm that might befall a four year old child left alone [awake] in an apartment," but cautioning at the same time that factual issues such as "the age of the child, the length of time involved, the maturity of the particular child, and the reason why the child was left alone" were "particularly unsuitable for determination on motion, and except in the most extreme cases, are best reserved for trial." Id. at *1, *3.
The majority reasonably proposes that, "if [ Reyes ] proceeded to trial, the prosecution would have been put to its burden to convince a jury that the defendant's conduct resulted in a likelihood of harm to her child and that the defendant knew that her conduct was likely to result in injury to her child." Maj. Op. at 621. Therefore, it follows, Reyes illustrates that "New York courts are cognizant of the line between 'bad parenting' and child endangerment, and provide prosecutors and juries with guideposts for determining when the factual circumstances of a case establish culpability ...." Id .
With respect, I must disagree with that conclusion. Although the Reyes court's decision to commit the judgment to a jury is *630 understandable, the "guideposts" that the majority sees in Reyes strike me as largely illusory. While New York state courts have published dispositions resolving motions to dismiss criminal complaints brought under § 260.10(1), as happened in Reyes , the parties have pointed to no judicial statements resolving a sufficiency challenge to a defendant's conviction on "home alone" charges under § 260.10(1), and I have identified none. This leaves the actual guideposts available for prosecutors making charging decisions and for defendants making plea decisions in fact encased in fog.
This vagueness persists, but not because New York only rarely prosecutes "home alone" cases under § 260.10(1) or has only recently begun to do so. Numerous New York courts have found criminal misdemeanor complaints under § 260.10(1) facially sufficient for prosecution on facts reminiscent of Reyes . See, e.g. , People v. Hot , 58 Misc.3d 1215A, 94 N.Y.S.3d 539, 2018 WL 652480 (Crim. Ct. 2018) (toddler left sleeping in car while mother shopped nearby); People v. Fielden , 48 Misc.3d 1212A, 18 N.Y.S.3d 581, 2015 WL 4460568 (Crim. Ct. 2015) (infant left awake in hotel room for one hour); People v. Eury , 46 Misc.3d 1208A, 7 N.Y.S.3d 244, 2015 WL 135097 (Crim. Ct. 2015) (four or five children aged under ten left alone, with four asleep, in apartment, for at least 40 minutes); People v. Gulab , 23 Misc.3d 1123A, 886 N.Y.S.2d 68, 2009 WL 1309785 (Crim. Ct. 2009) (two children ages five and ten home alone for two hours); People v. Fraser , 21 Misc.3d 1128A, 875 N.Y.S.2d 822, 2008 WL 4866334 (Crim. Ct. 2008) (security officer saw infant child in stroller in an apartment building hallway; defendant stated that she was "down the hall watching"); People v. Watson , 182 Misc.2d 644, 700 N.Y.S.2d 651, 655 (Crim. Ct. 1999) (seven-year-old child home alone awake for two-and-a-half hours).[7] As long ago as in 1997, in People v. Cenat , 176 Misc.2d 39, 671 N.Y.S.2d 578, 580 & n.2 (Crim. Ct. 1997), a New York trial court observed that "[o]ver the past few years the Criminal Court has seen a flood of cases charging Endangering the Welfare of a Child for leaving children of various ages 'home alone' " and reported at the time that "[t]here are over 200 [child endangerment] cases pending currently, a substantial number of which allege 'home alone' type allegations."
Despite the apparent frequency of prosecutions in "home alone" cases over an extended period, New York courts continue to express a range of inconsistent judicial views about legal sufficiency. See Eury , 46 Misc.3d 1208(A), 2015 WL 135097 at *3 ("[E]ven the simple question of whether [an] allegation that the defendant left a child or children alone for a time-without any aggravating circumstance-is sufficient has produced conflicting results."); Watson , 700 N.Y.S.2d at 655 (recognizing a "divergence in judicial views on the matter"). Matthews and amici provide a compelling and plausible explanation for the persistent haziness: such cases are overwhelmingly unlikely to go to trial (and, consequently, even less likely to present a sufficiency challenge for appellate review). For example, according to the New York State Division of Criminal Justice Services, and as reflected in the attached chart, in 2008-the year that Reyes was decided-4,851 people in the State were arrested for violating § 260.10(1). Approximately 33% of the resulting prosecutions were dismissed.[8] Of the remaining cases, approximately *631 80% were resolved by guilty plea.[9] Only forty-two people (approximately 1.3% of those whose cases were not dismissed) went to trial. Of these forty-two, twenty were convicted and twenty-two were acquitted. Put another way: of convictions obtained under § 260.10(1) in the year 2008, over 99% were obtained by guilty plea, resulting in no articulation at all of any "guideposts."
The reported data are similar for the other years in the dataset, which covers from 1990 through 2015.[10] The available statistics regarding these prosecutions thus suggest that, unless the complaint is dismissed as facially insufficient, defendants in a § 260.10(1) prosecution go to trial in about 1% of cases and will in approximately 80% of cases plead guilty to the charge, with no judicial articulation of any limits on their misdemeanor crimes.
These dramatic figures should not be surprising, even apart from the well-known frequency of plea bargains in the criminal justice system: the data further show that, in prosecutions under § 260.10(1) from 2000 to 2015, less than 20% of convictions resulted in any term of imprisonment at all; 43% of convictions led only to probation or a fine; and over 35% of convictions resulted in what the state calls a "conditional discharge," meaning a non-carceral sentence to which certain conditions are attached. Amici Br. 10. Significant here, by statute, a "conditional discharge" embodies a judicial finding that "neither the public interest nor the ends of justice would be served by a sentence of imprisonment" or even by probation. NYPL § 65.05(1)(a). When, in over one-third of prosecutions brought under the statute, the sentence for pleading guilty is of this type (and is understood to bear no immigration consequences), a defendant has little incentive to contest the charges or proceed to trial.
Despite these data, the majority's approach appears to require Matthews to show that a § 260.10(1) defendant charged with conduct outside the INA's generic definition could be convicted at trial and have his conviction upheld on appellate review. Absent that appellate statement, the construction of the statute that underlies his conviction has little import, the reasoning would go.
This approach is certainly defensible as a formal matter: after all, the New York state courts, not its prosecutors (or the local federal courts), have the final word on the correct construction of New York laws. But the Supreme Court has never described the "realistic probability" test in these terms, nor in my estimation does it make sense to require such a showing here. Rather, in Duenas-Alvarez , the Court required only a showing that "the State would apply its statute to conduct that falls outside the generic definition." 549 U.S. at 193, 127 S.Ct. 815 (emphasis added). More recently, in Moncrieffe , the *632 Court required a showing that "the State actually prosecutes the relevant offense" in a fashion that is inconsistent with the generic offense. 569 U.S. at 206, 133 S.Ct. 1678 (emphasis added). To import into the Court's "realistic probability" test a requirement that the state appellate courts describe the farthest contours of the state law's application strikes me as both unworkable and inappropriate, particularly in the context of a misdemeanor crime, and where (as here) courts are unlikely ever to have the opportunity to do so. An approach that by definition focuses on only the 0.8% of convictions that are secured following a jury trial (and the even smaller percentage that are subsequently upheld on appellate review) will necessarily fail to grasp "the elements of the offense in practice." Whyte v. Lynch , 807 F.3d 463, 469 (1st Cir. 2015).
The Supreme Court has not as yet applied, and we are rarely, if ever, called upon to apply the "realistic probability" test to misdemeanor statutes that criminalize conduct that is punished so leniently as the mine-run of prosecutions under § 260.10(1). But because the analysis that we undertake requires us to identify "the least of the acts criminalized under the state statute," Mellouli v. Lynch , --- U.S. ----, 135 S. Ct. 1980, 1986, 192 L.Ed.2d 60 (2015) (internal quotation marks omitted), and because the immigration consequences will be so severe, we must examine all available and reliable evidence regarding related convictions to ensure the accuracy of the New York endangerment statute's asserted match with the generic federal definition.
If the allegations in Reyes , discussed above, were deemed sufficient to survive a motion to dismiss, the case suggests that some defendants (indeed, based on the statistical evidence before us, possibly many defendants) have pleaded guilty to similar offense conduct. The only remaining question, then, is whether the conduct alleged in Reyes and similar "home alone" cases more closely approximates conduct creating the "sufficiently high risk of harm to a child" we required in Florez or the "bare potential for nonserious harm" described by the Ninth Circuit in Fregozo and distinguished by the BIA in Mendoza Osorio , 26 I. & N. Dec. at 711. Even drawing all factual inferences in favor of the prosecution in these cases, in my view the nature of the allegations presented and the judicial comments elicited seem far more consistent with the speculative "may be endangered" standard found wanting in Fregozo (or the "conduct that could threaten a child's welfare" found similarly insufficient by the Third Circuit in Liao , 910 F.3d at 722 ), than the "sufficiently high risk of harm to a child" that we demanded in Florez .[11]
*633 For these reasons, I conclude that Matthews has carried his burden of showing a "realistic probability" that New York prosecutes conduct under § 260.10(1) that falls outside the INA's generic definition of child abuse. I would grant his petition for review on this basis.
2) Import of the Charging Documents Presented by Amici
In similar vein, Matthews's amici have presented several arrest reports, complaints, and misdemeanor informations-the authenticity of which the Government does not contest-as reflecting New York State decisions to charge various individuals with state child endangerment misdemeanor violations for conduct such as: (1) driving with a suspended license while a minor child is in the car (Amici App. 2); (2) "yell[ing] and swing[ing] his backpack" in a store and knocking objects off shelves, thereby injuring a child (Amici App. 9-10); and (3) shoplifting while accompanied by children (Amici App. 12, 14, 16).[12] None of the charged conduct is commendable, to be sure, and under the "moral welfare" portion of the New York statute, prosecution may have been justifiable.
But the majority's position must be that, absent any evidence that the allegations in the charging documents ever led to convictions or were upheld by state courts as facially sufficient, these documents, too, do not suggest that individuals in New York have a "realistic probability" of conviction under § 260.10(1) for conduct falling outside the INA's generic definition of "child abuse." See Maj. Op. at 622-23. Such documents alone may not be sufficient to carry Matthews's burden, it is fair to say. But the broad range of conduct that they reflect as warranting state criminal charges further suggests that the statute has been used to charge conduct less than the generic INA definition of a crime of child abuse.[13]
*634 In sum, the charging documents adduced by amici illustrate further that, in addition to the "home alone" cases discussed above, New York State pursues prosecutions and secures convictions under § 260.10(1) in situations that, while doing no credit to the individuals convicted, " 'creat[e] only the bare potential for nonserious harm to a child.' " Mendoza Osorio , 26 I. & N. Dec. at 711 (quoting Fregozo , 576 F.3d at 1038 ). This, too, reinforces the conclusion that Matthews has demonstrated a "realistic probability" that the statute is more broadly applied than the INA offense.
II.
Beyond its unduly constrained analysis of the realities of NYPL § 260.10(1), the BIA's holding that Matthews is removable suffers from another troubling flaw. The agency's determination to apply its categorical equation of New York child endangerment with the INA definition of "child abuse" retroactively to Matthews and to others, newly rendering them deportable, can be expected to have a devastating effect on those who pleaded guilty to the New York misdemeanor years ago, understanding then that the likely consequence would be only probation or conditional discharge. The parties did not pursue the implications of this observation in their briefs on appeal here. But the agency has not proposed that its equation of New York law and the INA's generic definition has only prospective force, and its actions with regard to Matthews surely demonstrate the contrary.
We recently re-affirmed the following statement of five factors that we "weigh ... to determine whether an agency may apply a new rule retroactively":
(1) whether the case is one of first impression, (2) whether the new rule presents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order places on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.
Obeya v. Sessions, 884 F.3d 442, 445 (2d Cir. 2018) (quoting Lugo v. Holder , 783 F.3d 119, 121 (2d Cir. 2015) ). In Obeya , we also clarified that, "when conducting retroactivity analysis in the immigration context, we look to whether it would have been reasonable for a criminal defendant to rely on the immigration rules in effect at the time that he or she entered a guilty plea." Id. at 448 ; see also Velasquez-Garcia v. Holder , 760 F.3d 571, 582 (7th Cir. 2014) (applying similar retroactivity analysis). In the case of individuals who entered guilty pleas in New York under § 260.10(1) before today-and especially those who did so before Soram was decided-it is easy to conclude that they could have reasonably relied on the "immigration rules in effect at the time," in Obeya's phrase, and expected no immigration consequences at all from their guilty plea to misdemeanor child endangerment that garnered a sentence of probation or conditional discharge.
Here, as in Obeya , the first and fourth Lugo factors "are not seriously at issue in the case before us"; both favor Matthews. 884 F.3d at 445. As set forth in Part I, the interpretation of the INA's generic definition of "child abuse" is not a matter of first impression for the BIA, and the burden of *635 retroactive application-removal from the United States-is drastic. Accordingly, here, also as in Obeya , the "heart of this case rests with the second and third Lugo factors," that is, whether Soram (and Mendoza Osorio ) marked "abrupt departure[s]" from the BIA's "well-established practice," and whether Matthews reasonably relied on the "former rule." Id.
Between 1999 and 2008, as observed in Part I, the BIA's sole statement concerning the generic federal definition was that it encompassed "[a]ny form of cruelty to a child's physical, moral or mental well-being." Rodriguez-Rodriguez , 22 I. & N. Dec. at 996 ; see also Velazquez-Herrera v. Gonzales , 466 F.3d 781, 783 (9th Cir. 2006) ("The source Rodriguez-Rodriguez consulted, Black's Law Dictionary 405 (8th ed. 2004), defines 'cruelty' as '[t]he intentional and malicious infliction of mental or physical suffering on a living creature.' "). Then, in 2008, the BIA lowered the requisite mens rea to criminal negligence. See Velazquez-Herrera , 24 I. & N. Dec. at 511-12 n.13 (repudiating Rodriguez-Rodriguez 's reliance on Black's Law Dictionary's definition of "cruelty," and holding that under "the weight of Federal and State authority in effect in 1996 ... criminally negligent acts sufficed"). But even Velazquez-Herrera retained the suggestion that "the infliction on a child of ... harm, even if slight" was a necessary element of the generic offense. Id. at 512. Only in 2010, in Soram , did the BIA finally state its current view that "actual harm or injury to the child" was not required as an element of the generic crime. 25 I. & N. Dec. at 381.
In this context, where the BIA has materially changed its interpretation of the generic offense, the second Lugo factor-whether there has been an "abrupt departure"-weighs in favor of Matthews. Consequently, because "[t]here can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions," INS v. St. Cyr , 533 U.S. 289, 322, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), the third Lugo factor favors Matthews as well. It is fair, then, to conclude that Matthews's 2002 and 2003 convictions should not render him deportable under the contemporaneous BIA interpretation, on which he could have reasonably relied.
Accordingly, even if I agreed with the merits of the BIA's recent alignment of § 260.10(1) and the generic federal definition, I would still hold that, under Obeya and Lugo , this rule could not be applied retroactively to Matthews and those similarly situated. I would grant his petition for review on this ground as well. The majority does not address this question and its opinion should not foreclose other individuals from challenging the BIA's retroactive application of its definition to them.
III.
Even apart from retroactivity concerns, the implications of the BIA's interpretation of § 260.10(1) that the majority affirms here today reach well beyond Matthews's case. In addition to being at odds with the "realistic probability" analysis, the holding leads to harsh results that I believe are unlikely to have been intended by Congress.
As the BIA recounted in Matter of Velazquez-Herrera , when passing the statute that added "a crime of child abuse, child neglect, or child abandonment" to the list of offenses rendering an individual deportable, Congress "clearly intended to single out those who have been convicted of maltreating or preying upon children." 24 I. & N. Dec. at 509. We have been alerted to no basis for concluding that, in so doing, Congress *636 also intended to render deportable parents who, in a possible violation of a state child endangerment statute and in a display of bad judgment, leave their child alone briefly, commit minor offenses in the presence of a child, or engage in other conduct that might allow for the possibility of relatively minor harm befalling a child. Surely such acts fall outside of the general understanding of "child abuse," even broadly interpreted.
Indeed, the BIA has adduced no evidence that Congress (in enacting 8 U.S.C. § 1227(a)(2)(E)(i) ), the New York legislature (in enacting § 260.10(1) ), or the New York judiciary (in leniently sentencing § 260.10(1) violations) desired or even recognized that permanent family separation could be triggered by such lapses in judgment in childrearing, as blameworthy as they may be. See Martinez-Cedillo , 896 F.3d at 1002 (Wardlaw, J. , dissenting) ("It should not be lost on us that, while we fault [Respondent] for endangering his son, we simultaneously condone the separation of a family, exiling a father of two children who has resided in the United States lawfully for more than twenty-five years. That Congress did not intend such a result is apparent from these facts.").[14]
Paradoxically, it is children who will suffer harm under the agency's interpretation of § 260.10(1) -a law intended for their protection. In addition to subjecting lawful permanent residents to deportation, under the agency's rule, non -permanent residents become not only removable but also statutorily ineligible for cancellation of removal because of such a conviction. See 8 U.S.C. § 1229b(b)(1)(C) (excluding aliens "convicted of an offense under section ... 1227(a)(2)" from such relief). Even in cases where a non-permanent resident can otherwise prove that removal would result in exceptional and extremely unusual hardship to U.S. citizen or lawfully resident children, the agency's position, affirmed by the majority, will compel the immigration courts to deny them relief. See id. § 1229b(b)(1)(D) ; Matter of Monreal , 23 I. & N. Dec. 56, 62 (BIA 2001) (to qualify for such relief, "the hardship to an alien's [children], if the alien is obliged to leave the United States, must be 'substantially' beyond the ordinary hardship that would be expected when a close family member leaves this country"). It requires no exercise of judicial imagination to conclude that a child will be harmed by being separated from a parent, who, even if imperfect, is generally competent and caring.
I am also concerned that another vulnerable group will be harmed by this result as well-victims of domestic violence. Under the BIA's interpretation, a conviction under § 260.10(1) will also render a noncitizen ineligible for cancellation of removal under the "battered spouse or child" provisions of VAWA. See 8 U.S.C. § 1229b(b)(2)(A)(iv) (excluding individuals deportable under "paragraphs ... (2) through (4) of section 1227(a)" from relief). This provision allows an immigration court, subject to certain conditions, to grant cancellation of removal to individuals who have been "battered or subjected to extreme cruelty" by a spouse who is a U.S. citizen or lawful permanent resident. Id. § 1229b(b)(2)(A). The statute's text and legislative history offer strong signals that Congress intended VAWA's immigration-related provisions to serve as a safety valve aimed at preventing victims of domestic violence who depend on a spouse for immigration status from becoming trapped in violent relationships.[15] It seems *637 extremely unlikely that Congress intended that domestic violence victims previously convicted of a minor child endangerment misdemeanor be barred from relief when it created VAWA's immigration-related remedies, years before the BIA's definition of a crime of "child abuse, child neglect, or child abandonment" expanded in Soram , in 2010, to reach its current capacious state.
In sum, the majority affirms an agency ruling that inflicts an array of troubling collateral consequences on a broad class of non-citizens. That Congress so intended, sub silentio, by making a crime of "child abuse" a removable offense strikes me as implausible. These considerations, too, support the conclusion reached in Parts I and II that Matthews's petition for review should be granted.
* * *
Our country's immigration laws address the tension between promoting public safety by removing non-citizens who have violated our criminal laws in a domestic setting, on one hand, and pursuing the "underlying intention ... regarding the preservation of the family unit," Nwozuzu v. Holder , 726 F.3d 323, 332 (2d Cir. 2013) (quoting H.R. Rep. No. 82-1365 (1952)), on the other. We have acknowledged that one of the law's goals is "to keep families intact where possible." Nwozuzu , 726 F.3d at 332 ; see also Ibarra v. Holder , 736 F.3d 903, 918 n.20 (10th Cir. 2013) (declining to defer to the BIA's ruling in Soram and declaring, "[O]ne of the purposes of the INA is 'keeping families of United States citizens and immigrants united,' not just deporting people." (internal citation omitted)).
In its incorrect ruling that New York misdemeanor child endangerment law is equivalent to the INA's generic definition of child abuse, the BIA ignores the real-world application of the New York statute. It also averts its eyes from the real-world effect of its decision: the needless and potentially permanent separation of children from their parents. Retroactive application of the agency's ruling will run afoul of the principles that we established in Lugo and Obeya . Its prospective application will inflict needless suffering on some of the most vulnerable members of our society.
For these reasons, I respectfully dissent.
Attachment
*638 Arrest Year Count 1990 1991 1992 1993 1994 1995 1996 1997 1998 1999 2000 2001 2002 2003 2004 2005 2006 2007 2008 2009 2010 2011 2012 2013 2014 2015* New York State Total Arrests 1484 1787 2077 2186 2505 3000 3703 4079 4459 4510 4615 4730 4827 4563 4463 4634 4793 4765 4851 5123 4946 4890 4905 4836 4468 2392 Open-No Dispo Reported 83 146 152 103 138 156 182 207 190 180 344 336 360 350 374 337 339 301 359 379 408 477 520 646 1403 1791 Convicted-Verdict 6 12 18 4 16 17 17 24 28 29 22 25 27 22 27 14 20 25 20 34 19 12 14 15 6 0 Convicted-Plea 737 858 1019 1122 1349 1573 2067 2160 2476 2510 2469 2500 2714 2489 2422 2509 2522 2594 2584 2753 2539 2415 2560 2394 1889 398 Dismissed 589 686 775 869 852 1099 1255 1478 1523 1536 1551 1618 1472 1459 1392 1519 1622 1538 1586 1630 1664 1624 1468 1498 912 123 Acquitted 5 9 8 11 14 11 10 15 15 21 13 18 14 20 14 14 17 23 22 15 13 17 11 7 8 2 Not Prosecuted 22 13 33 19 48 61 61 77 89 84 85 102 86 80 100 102 124 127 132 143 146 174 123 126 113 57 Other 42 63 72 58 88 83 111 118 138 150 131 131 154 143 134 139 149 157 148 169 157 171 209 150 137 21 Prison 3 2 1 0 5 4 5 6 5 10 12 8 10 5 9 11 2 7 11 7 6 4 6 5 2 0 Time Served 48 40 40 55 55 78 98 95 113 90 111 143 117 139 101 102 117 110 124 120 120 117 122 149 111 36 Jail 92 96 125 123 166 190 265 285 275 285 267 275 294 248 286 307 310 343 337 373 323 303 370 328 226 56 Jail+Probation 27 20 30 24 40 42 51 69 73 73 51 54 77 61 68 55 68 52 69 66 64 43 45 46 25 4 Probation 115 135 184 191 203 247 343 338 366 374 386 344 385 366 360 347 361 294 297 317 279 236 270 216 185 27 Fine 239 263 322 329 409 497 633 677 834 899 819 881 930 895 762 826 768 820 797 816 704 723 745 654 525 107 Cond Discharge 212 307 328 393 467 514 659 685 817 780 829 800 907 766 813 843 868 942 922 1031 1017 957 962 984 796 166 Other 7 7 7 11 20 18 30 30 21 28 16 20 21 31 30 32 48 51 47 57 45 44 54 27 25 2

These facts are taken from the April 7, 2016 order of the Immigration Judge finding Matthews removable.

A prior removal order was entered against him in 2011 based on convictions that he sustained in the 1990s for public lewdness, a violation of NYPL § 245.00. The order was rescinded after he successfully challenged it. See Matthews v. Holder , 590 Fed. App'x 75 (2d Cir. 2015).

Section 237(a)(2)(E)(i) of the INA is codified at 8 U.S.C. § 1227(a)(2)(E)(i). For the reader's convenience, I refer to 8 U.S.C. § 1227(a)(2)(E)(i), the codified section, instead of the section number in the enacted bill.

The BIA's discussion in Rodriguez-Rodriguez was dictum. Nevertheless, the agency cited its "cruelty" formulation in several non-precedential decisions preceding Velazquez-Herrera . See, e.g., In re Pacheco Fregozo , 2005 WL 698590, at *1 (BIA 2005) ; In re Maltez-Salazar , 2005 WL 952489, at *1 (BIA 2005) ; In re Manzano-Hernandez , 2005 WL 698392 at *2 (BIA 2005).
In turn, several Circuit courts deferred to the formulation stated in Rodriguez-Rodriguez , and this Court, in a footnote, suggested that it provided the operative definition. See Ochieng v. Mukasey , 520 F.3d 1110, 1114-15 (10th Cir. 2008) (deferring to Rodriguez-Rodriguez ); Loeza-Dominguez v. Gonzales , 428 F.3d 1156, 1158 (8th Cir. 2005) (same); Nguyen v. Chertoff , 501 F.3d 107, 114 n.9 (2d Cir. 2007) (noting Rodriguez-Rodriguez definition).

The Ninth Circuit's decision in Martinez-Cedillo and Judge Wardlaw's dissent in that case were withdrawn pending en banc review. Martinez-Cedillo v. Barr , 918 F.3d 601 (9th Cir. 2019). The appeal was recently dismissed altogether as moot in light of the petitioner's death. Martinez-Cedillo v. Barr , No. 14-71742, 923 F.3d 1162, 2019 WL 2136113 (9th Cir. May 16, 2019). I cite to Judge Wardlaw's observations for their persuasive value alone.

The majority's application of the "realistic probability" test is largely consistent with that of the BIA in Mendoza Osorio , 26 I. & N. Dec. 703, where the agency rejected similar arguments raised by the respondent and held that § 260.10(1) was categorically a "crime of child abuse" under the INA. Id. at 712. Because the BIA has "no expertise in construing ... state criminal statutes," however, the majority rightly subjected the BIA's interpretation of § 260.10(1) to de novo review. See Gill v. I.N.S. , 420 F.3d 82, 89 (2d Cir. 2005). Accordingly, I refer to the majority's conclusions rather than the agency's in this discussion.

Worthy of observation in connection with VAWA, with the sole exception of Watson , only women were charged in these "home alone" cases.

The Government has not contested the accuracy of the statistics presented by amici, which amici advise were obtained by amicus Immigrant Defense Project from the New York State government pursuant to a request for information under New York's Freedom of Information Law. Amici Br. 23 n.8. I see no reason why they should not be subject to judicial notice. See Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.")

These numbers do not add up to 100% because 359 cases remained open without disposition; 132 cases were not prosecuted; and 148 cases in the chart were simply labeled "other," without further specification.

The full database cited by amici is available at https://www.immigrantdefenseproject.org/wp-content/uploads/2016/06/DCJS-EWOCdata-arrs-dispos-sents.pdf (last accessed June 3, 2019).

Tending to reinforce this conclusion, New York courts have accepted remarkably slim "risk of harm" showings in some § 260.10(1) prosecutions. For example, in People v. Simmons , 92 N.Y.2d 829, 677 N.Y.S.2d 58, 699 N.E.2d 417 (1998), the New York Court of Appeals upheld the endangerment conviction of a child care worker who "repeatedly direct[ed] vulgar remarks of a sexual nature" at a two-year-old child. Id. at 830, 677 N.Y.S.2d 58, 699 N.E.2d 417. On appeal, the defendant challenged the scant record evidence regarding the likelihood of harm inflicted on the child. Rejecting that challenge, the court explained that, "regardless of the child's current level of understanding," the jury needed no evidence on the issue of harm, but could rely on its "common human experience and commonsense understanding of the nature of children" to conclude that the remarks were "likely to have caused the child harm, and that defendant knew that her remarks were likely to cause the child to suffer harm." Id. at 831, 677 N.Y.S.2d 58, 699 N.E.2d 417.
Judge Titone observed in dissent that the prosecution itself had "put forth proof that the young girl here did not understand appellant's lewd questions," and opined that the jury had "no evidentiary basis ... to conclude that the young girl would likely be harmed"; rather, the "evidence pointed only to the conclusion that the child here was nothing more than a baby who was capable of mouthing the words 'yes, yes' but said this to 'everything' regardless of context or content." Id. at 832, 677 N.Y.S.2d 58, 699 N.E.2d 417 (Titone, J. , dissenting).
In my view, the Simmons decision and cases of this ilk provide another persuasive indication that state prosecutors apply NYPL § 260.10(1) outside the generic federal definition.

The majority accepts the government's argument that we should not consider these charging documents because Matthews did not introduce them into the administrative record below. See 8 U.S.C. § 1252(b)(4)(A) ("[T]he court of appeals shall decide the petition only on the administrative record on which the order of removal is based."). But introducing such documents into the record below would have been futile. By the time Matthews was ordered removed by the Immigration Judge in April 2016 based on his two aged § 260.10(1) convictions, the BIA had already decided in Mendoza Osorio that the New York statute was categorically a crime of child abuse. And in Mendoza Osorio -a decision that we did not have the opportunity to review directly-the BIA was presented with, and refused to consider, similar charging documents. 26 I. & N. Dec. at 707 n.4. Although they were not incorporated into the administrative record, I see no unfairness or impropriety in considering their implications. The BIA was familiar with this public record evidence from the proceedings in the context of its Mendoza Osorio decision, and the documents do not concern factual matters on which credibility was an issue or testimony appropriate.

Although it did not survive appellate review, one particular reported conviction also tends to confirm the impression created by amici's submissions that the statute is charged broadly and on occasion idiosyncratically. In this odd case, a horse-farm owner was convicted after a bench trial of violating § 260.10(1) "after she injected a dog with a tranquilizer in the presence of a child." People v. Kanciper , 100 A.D.3d 778, 954 N.Y.S.2d 146, 147 (2d Dep't 2012). The case history demonstrates that a prosecutor may charge (and secure the conviction of) an individual on allegations where the harm to the child is highly speculative.

See note 5, supra , for Martinez-Cedillo 's subsequent appellate history.

The Report of the House Committee on the Judiciary accompanying the legislation explained:
Domestic battery problems can become terribly exacerbated in marriages where one spouse is not a citizen, and the non-citizen[']s legal status depends on his or her marriage to the abuser. Current law fosters domestic violence in such situations by placing full and complete control of the alien spouse's ability to gain permanent legal status in the hands of the citizen or lawful permanent resident spouse. ... Consequently, a battered spouse may be deterred from taking action to protect himself or herself, such as filing for a civil protection order, filing criminal charges, or calling the police, because of the threat or fear of deportation.
H. R. Rep. 103-395 at 26, 1993 WL 484760 (1993).