16-3922-ag
Obeya v. Sessions

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2017

(Argued: October 30, 2017     Decided: March 8, 2018)

Docket No. 16-3922-ag

CLEMENT OBEYA,

*Petitioner*,

— v. —

JEFFERSON B. SESSIONS III, United States Attorney General,

*Respondent*.

B e f o r e:

LYNCH and CARNEY, *Circuit Judges*, and HELLERSTEIN, *District Judge.*[*]

Clement Obeya, a lawful permanent resident of the United States, was convicted of petit larceny under New York law. The government sought to remove Obeya for his conviction, treating it as a "crime involving moral

---

[*] Judge Alvin K. Hellerstein, of the United States District Court for the Southern District of New York, sitting by designation.

turpitude." The Immigration Judge and Board of Immigration Appeals found that Obeya was removable based on his conviction, but this Court remanded due to the agency's failure to apply BIA precedent holding that larceny involves moral turpitude only when it is committed with the intent to deprive the owner of property permanently. On remand, the BIA again found Obeya removable, holding that his offense involved moral turpitude by applying a new rule, announced in another case that same day, expanding the types of larceny that qualify as such crimes. Obeya challenges the BIA's retroactive application of that rule to his case. We GRANT review and REVERSE the BIA's order.

———————

RICHARD MARK, Gibson, Dunn & Crutcher LLP, New York, NY, *for Petitioner*.

RACHEL L. BROWNING , Trial Attorney (Claire L. Workman, Senior Litigation Counsel, *on the brief*), Office of Immigration Litigation, *for* Chad A. Readler, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC, *for Respondent*.

Andrew Wachtenheim, Immigrant Defense Project, New York, NY, *for Amicus Curiae Immigrant Defense Project*.

———————

GERARD E. LYNCH, *Circuit Judge*:

Clement Obeya is a lawful permanent resident of the United States. In 2008, he was convicted of petit larceny under New York law. The government initiated removal proceedings against Obeya, charging that his conviction constituted a "crime involving moral turpitude." The Immigration Judge ("IJ") found that Obeya was removable based on his conviction and the Board of

Immigration Appeals ("BIA") affirmed, but this Court held that the IJ had failed to apply BIA precedent holding that larceny involves moral turpitude under 8 U.S.C. § 1227(a)(2)(A)(i) only when committed with the intent to deprive the owner of property permanently. *See Obeya v. Holder*, 572 F. App'x 34 (2d Cir. 2014) ("*Obeya I*"), granting pet. for review of *Matter of Obeya*, No. A055 579 757 (B.I.A. Aug. 7, 2012). We therefore remanded to the BIA "to determine in the first instance whether Obeya's conviction under [N.Y. Penal Law § 155.25]" rendered him removable. *Obeya I*, 572 F. App'x at 35.

On remand, the BIA again found Obeya removable. *See Matter of Obeya*, 26 I. & N. Dec. 856 (B.I.A. 2016) ("*Obeya II*"), aff'g No. A055 579 757 (Immig. Ct. Batavia Mar. 13, 2012). But the BIA did not rely in *Obeya II* on the precedent that this Court had identified in *Obeya I*; rather, the BIA found Obeya removable under a new rule first announced in a case decided the same day as *Obeya II*. *See Matter of Diaz-Lizarraga*, 26 I. & N. Dec. 847 (B.I.A. 2016). In his present petition to this Court, Obeya challenges the BIA's retroactive application of that rule to his case. For the reasons set forth below, we again GRANT review and REVERSE the BIA's latest order.

3

## BACKGROUND

Obeya, a native and citizen of Nigeria, was admitted into the United States in 2004 as a lawful permanent resident. Four years later, in the County Court of Albany, New York, he pled guilty to petit larceny in violation of Section 155.25 of the New York Penal Law. That offense carries a maximum penalty of one year's imprisonment. *See* N.Y. Penal Law §§ 70.15(1), 155.25. The court sentenced Obeya to three years' probation, and in 2011 sentenced him to ten months' imprisonment for violating the terms of his probation.

Shortly after Obeya's conviction, the Department of Homeland Security charged him with being removable under 8 U.S.C. § 1227(a)(2)(A)(i) as an alien convicted of a crime involving moral turpitude, committed within five years of admission to the United States, for which a court may impose a sentence of one year or longer.

The IJ held that Obeya was removable because "*any type* of larceny or theft offense . . . constitutes a crime involving moral turpitude." A.R. 787–88 (emphasis added). The BIA dismissed Obeya's appeal. He then petitioned this Court for review, which we granted because "under BIA precedent larceny constitutes a [crime involving moral turpitude] 'only when a *permanent taking* is intended.'"

4

*Obeya I*, 572 F. App'x at 35, quoting *Wala v. Mukasey*, 511 F.3d 102, 106 (2d Cir. 2007) (Sotomayor, *J.*) (emphasis added). Because the IJ had misstated the law, we remanded the case to the BIA "to determine in the first instance whether Obeya's conviction under [N.Y. Penal Law] § 155.25 constitutes a [crime involving moral turpitude]." *Id.*

On remand, the BIA again dismissed Obeya's appeal, holding in a November 16, 2016, decision that, under the published opinion issued that same day in *Diaz-Lizarraga*, 26 I. & N. Dec. 847, the BIA now deemed theft crimes to involve moral turpitude where there is "an intent to deprive the owner of his [or her] property *either* permanently *or* under circumstances where the owner's property rights are substantially eroded." *Obeya II*, 26 I. & N. Dec. at 859, quoting *Diaz-Lizarraga*, 26 I. & N. Dec. at 854 (emphasis added). The BIA noted that although "the plain language" of New York's petit larceny statute "does not require a showing that a permanent deprivation or substantial erosion of property rights was intended," *id.* at 860, the New York Court of Appeals "has determined that a conviction for larceny requires proof of an intent 'to exert permanent or virtually permanent control over the property taken,'" *id.*, quoting *People v. Medina*, 18 N.Y.3d 98, 105 (2011). According to the BIA, the larceny

5

statute's inclusion of "virtually permanent" deprivations of property brought it under *Diaz-Lizarraga*'s "substantial erosion" standard. *Id.* at 860–61. Obeya petitions this Court for review.

## DISCUSSION

Obeya argues that the BIA erred by retroactively applying the rule announced in *Diaz-Lizarraga* to his case. It did.[1]

Agencies may create new rules through adjudication, but the retroactive application of the resulting rules "must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles." *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947). We weigh the following factors to determine whether an agency may apply a new rule retroactively:

> (1) whether the case is one of first impression, (2) whether the new rule presents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden

---

[1] Because we hold that the BIA erred by retroactively applying its new standard to Obeya, we do not reach his alternative arguments that the BIA exceeded the scope of this Court's decretal language in *Obeya I* and that petit larceny under New York law is not a crime involving moral turpitude even under the *Diaz-Lizarraga* standard.

which a retroactive order places on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Lugo v. Holder*, 783 F.3d 119, 121 (2d Cir. 2015).

As in *Lugo*, the first and fourth factors "are not seriously at issue in the case before us," *id.*, and both favor Obeya. The intent necessary for a larceny crime to involve moral turpitude was resolved in "the Board's earliest days," and is not an issue of first impression for the BIA. *Diaz-Lizarraga*, 26 I. & N. Dec. at 849–50 (collecting cases speaking to that issue dating back to 1941). And the government concedes that the fourth factor, the burden of retroactive application, favors Obeya because "removal from the United States, with life-changing consequences," is a "massive" burden for any immigrant. *Lugo*, 783 F.3d at 121; Resp. Br. at 35. All the more so for Obeya, who arrived in this country at the age of 17 and has few if any close relations in Nigeria.

The heart of this case rests with the second and third *Lugo* factors: whether *Diaz-Lizarraga* was an abrupt departure from BIA precedent and whether Obeya relied on the previous rule when pleading guilty. The government argues that the BIA did not depart in *Diaz-Lizarraga* from its precedent regarding when larceny involves moral turpitude. Rather, the BIA was merely "revising its

standard to reflect the modern definition of theft" without "distancing itself from the results reached under its prior standard." Resp. Br. at 33. If the BIA did not change its rule, Obeya's reliance on that rule would be irrelevant.

Both the language of *Diaz-Lizarraga* and the history of theft statutes in this country belie the government's argument. In *Diaz-Lizarraga*, the BIA explained that "[f]rom the Board's earliest days [it] ha[s] held that a theft offense categorically involves moral turpitude if—and only if—it is committed with the intent to *permanently* deprive an owner of property." 26 I. & N. Dec. at 849 (emphasis in original). That rule was adopted during a period when most theft statutes "distinguish[ed] between substantial and reprehensible deprivations of an owner's property on the one hand and, on the other, mere de minimis takings." *Id.* at 850.

Since that time, most states have updated their theft statutes to reflect the terms of the Model Penal Code's article on theft crimes, which requires for a larceny conviction that a defendant take property "with purpose to deprive [the owner] thereof," and defines "deprive" to include takings of property "permanently or for so extended a period as to appropriate a major portion of [the property's] economic value." Am. Law Inst., Model Penal Code &

8

Commentaries, pt. II, §§ 223.0(1), 223.2(1) (Official Draft & Revised Comments 1980); *see Diaz-Lizarraga*, 26 I. & N. Dec. at 851–52 & nn.4–8 (collecting statutes and cases from around the country "recogniz[ing] that many temporary takings are as culpable as permanent ones"). The BIA explained in *Diaz-Lizarraga* that its "case law ha[d] not kept pace with [those] developments" and that it accordingly decided to "update [its] existing jurisprudence," holding that "a theft offense is a crime involving moral turpitude if it involves an intent to deprive the owner of his [or her] property either permanently *or* under circumstances where the owner's property rights are substantially eroded." 26 I. & N. Dec. at 852–53 (emphasis added).

The BIA's own words in *Diaz-Lizarraga* trace this transformation for us. For decades, the BIA applied one rule: that a larceny offense constitutes a crime involving moral turpitude only when the larceny statute in question required, as had the common law, an intent to deprive the victim of property permanently. But in *Diaz-Lizarraga*, acknowledging that most states had expanded on the common law definition of larceny after the promulgation of the Model Penal Code to cover a broader range of conduct, the BIA decided to "update" its rule and to expand its definition of moral turpitude to cover conduct that better

9

reflects the modern definition of larceny. The BIA thus explicitly acknowledged that *Diaz-Lizarraga* created a new rule, different from the one that it acknowledged it had followed "[f]rom the Board's earliest days." *Id.* at 849.

The government cites several BIA and circuit court opinions decided before *Diaz-Lizarraga* to argue that "crimes of theft and larceny . . . [had already been] *presumed* to involve moral turpitude," Resp. Br. at 30 (emphasis added),[2] or that the BIA had previously determined that "a conviction under [N.Y. Penal Law] § 155.25 was categorically a crime involving moral turpitude." *Id.* at 34, n.7.[3] But we have reviewed those cases and find them unconvincing.

For example, in *Matter of Jurado-Delgado*, 24 I. & N. Dec. 29 (B.I.A. 2006), the BIA examined a conviction under a Pennsylvania law defining "retail theft" as "tak[ing] possession of . . . any merchandise displayed, held, stored or offered for sale by any store or other retail mercantile establishment." 18 Pa. Cons. Stat.

---

[2] *See, e.g., Chiaramonte v. INS*, 626 F.2d 1093 (2d Cir. 1980); *Brett v. INS*, 386 F.2d 439 (2d Cir. 1967); *Giammario v. Hurney*, 311 F.3d 285 (3d Cir. 1962); *Matter of Jurado-Delgado*, 24 I. & N. Dec. 29 (B.I.A. 2006); *Matter of Grazley*, 14 I. & N. Dec. 330, 333 (B.I.A. 1973).

[3] *See Matter of Roman Arturo Gomez*, No. A041 424 512, 2011 WL 6965228 (B.I.A. Dec. 21, 2011); *Matter of Luis Manuel Germosen Nunez*, No. A045 237 711, 2009 WL 2981799 (B.I.A. Aug. 28, 2009); *Matter of Jospeh Pierre*, No. A34 362 043, 2004 WL 5537104 (B.I.A. Jan. 31, 2004).

§ 3929(a)(1) (1991); *see* 24 I. &. N. Dec. at 33 n.1. Though the statute did not require an intent to deprive the owner of the merchandise permanently, the BIA found that retail theft under Pennsylvania law was a crime involving moral turpitude because it was "reasonable to assume that the taking [was] with the intention of retaining the merchandise permanently." *Jurado-Delgado*, 24 I. & N. Dec. at 34.

Notably, the BIA did not dispense with the requirement of an intent to permanently deprive the owner of the property; rather, it held that "the nature and circumstances surrounding" an offense under the Pennsylvania retail theft law created a presumption of such intent. *Id.* at 33. That "nature and circumstances" test was useful to the BIA where it was able to determine from the face of the statute the type of property that the petitioner stole. Even where a statute does not make clear the type of property at issue, the BIA has presumed an intent to permanently deprive where it could determine the type of property at issue from other sources in the record. Thus, in *Matter of Grazley*, the BIA found it "reasonable to assume, *since cash was taken*, that [petitioner] took it with the intention of retaining it permanently." 14 I. & N. Dec. 330, 333 (B.I.A. 1973) (emphasis added). But where, as here, the categorical approach prevents the BIA

11

from examining the property involved in the underlying offense, and the offense statute does not indicate the type of property at issue, the BIA cannot determine whether it is appropriate to presume an intent to permanently deprive.[4]

---

[4] Though not at issue in this appeal, the categorical approach plays an important role in Obeya's case, and it requires brief explication. When the government alleges that a prior state conviction may serve as a predicate offense for removal under the Immigration and Nationality Act ("INA"), "we generally employ a 'categorical approach' to determine whether the state offense is comparable to an offense listed in the INA." *Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013); *see also Wala*, 511 F.3d at 107. "Under the categorical approach, we consider the offense generically, that is to say, we examine it in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *United States v. Beardsley*, 691 F.3d 252, 259 (2d Cir. 2012) (internal quotation marks omitted). We may look to portions of the conviction record, under a modified categorical approach, when a statute "comprises multiple, alternative versions of the crime," *i.e.*, is "divisible," but only to the extent necessary "to identify, from among several alternatives, the crime of conviction." *Descamps v. United States*, 570 U.S. 254, 262–64 (2013). In determining whether an offense renders an alien removable, we focus only "on the elements, rather than the facts, of a crime." *Id.* at 263.

     The BIA applied the categorical approach, unmodified, in *Obeya II*, looking to the elements of the New York petit larceny statute to determine whether it was "categorically a crime involving moral turpitude." 26 I. & N. Dec. at 861. On appeal, both parties agree that the categorical approach was proper.

     New York Penal Law § 155.25 is not limited to any specific type of property, and so the BIA's presumption of an intent to deprive permanently is not relevant here. By contrast, the Pennsylvania retail theft law at issue in *Jurado-Delgado* specifically indicates the type of property that Jurado-Delgado stole—"merchandise . . . offered for sale by any store or other retail mercantile establishment." 18 Pa. Cons. Stat. § 3929(a)(1) (1991); *see* 24 I. &. N. Dec. at 33 n.1. *Grazley* is inapplicable; there, the BIA looked to "such facts as . . . appear[ed] from the record of conviction"—long before the Supreme Court clarified in *Descamps*

This Circuit has long recognized that, under BIA precedent, "ordinarily, a conviction for theft is considered to involve moral turpitude only when a permanent taking is intended." *Wala*, 511 F.3d at 106 (brackets omitted). We noted in *Wala* that the BIA had written inconsistently on that subject over the years, sometimes failing to distinguish between a permanent and a temporary taking, and other times "suggest[ing] that whether this distinction actually exists is an open question." *Id.* at 106, n.3. But we ultimately concluded that the BIA required an intended permanent taking for larceny to be considered a crime of moral turpitude, specifically noting that although the BIA was "free to reconsider its view of what types of larcenies amount to [crimes involving moral turpitude]," it had not yet done so. *Id.*[5]

Now, in *Diaz-Lizarraga*, the BIA has done exactly that. It admitted as much in *Obeya II*, where it frankly explained that the BIA had "long held that a theft offense only involves moral turpitude if it is committed with the intent to permanently deprive the owner of property." 26 I. &. N. Dec. at 857. But it

---

that that was inappropriate—to find that Grazley stole a "change purse containing money and stamps." 14 I. & N. Dec. at 333.

[5] We followed that precedent in *Obeya I*, again reading then-existing BIA case law to find moral turpitude only when an alien was convicted of an offense requiring an intent to deprive a victim of property permanently.

"revisit[ed] [its] precedent decisions concerning the requisite intent for larceny crimes in the context of a crime involving moral turpitude" in *Diaz-Lizarraga*. *Id.* at 858.[6] Given the BIA's case law, this Court's prior well-established understanding of that case law, and the Board's own descriptions of its precedents in the opinion that adopted the new rule and in the very order of which Obeya seeks review, we conclude that *Diaz-Lizarraga* expressly effected a clear departure from longstanding BIA precedent.

Obeya's reliance on that precedent—the third *Lugo* factor—follows naturally from our determination that the BIA abandoned a decades-old rule in *Diaz-Lizarraga*. "There can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions." *INS v. St. Cyr*, 533 U.S. 289, 322 (2001). So much so that "deportation is an integral part—indeed,

---

[6] It is of no consequence that the BIA, as the government argues, retrospectively characterized its earlier test as intended to distinguish between "'substantial and reprehensible deprivations of an owner's property on the one hand and, on the other, mere de minimis takings in which the owner's property rights [were] compromised little, if at all.'" Resp. Br. at 31–32 (alteration in original), quoting *Diaz-Lizarraga*, 26 I. & N. Dec. at 850. Whatever the *purpose* of the test, and regardless of whether the new test is better suited to such a purpose, the BIA admitted in both *Diaz-Lizarraga* and *Obeya II* that it was explicitly changing the applicable legal rule.

14

sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010) (footnote omitted).

In *Lugo* we remanded to the BIA to consider whether, in light of *St. Cyr* and *Padilla*, a noncitizen "should automatically be assumed to have relied on existing rules limiting deportation at the time she pled guilty." 783 F.3d at 122. But in the intervening years the BIA has failed to do so, and the government does not raise that issue in this appeal, instead arguing against a finding of reliance based solely on its position that *Diaz-Lizarraga* was not a departure from BIA precedent. We therefore take this opportunity to clarify that, when conducting retroactivity analysis in the immigration context, we look to whether it would have been reasonable for a criminal defendant to rely on the immigration rules in effect at the time that he or she entered a guilty plea. In doing so, we join the Seventh Circuit's considered holding that, in determining the retroactive effect of an agency's immigration rules, "the critical question is not whether a party actually relied on the old law, but whether such reliance would have been reasonable."

*Velasquez-Garcia v. Holder*, 760 F.3d 571, 582 (7th Cir. 2014).[7] It was eminently

reasonable for Obeya, in entering a guilty plea to a charge of petit larceny, to rely

on seven decades of BIA precedent, reinforced by this Court in *Wala*, holding that

larceny offenses involve moral turpitude only when a permanent taking is

intended.[8]

As for the fifth *Lugo* factor—the government's interest in applying the new

rule despite Obeya's reliance on the old rule—the government asserts "a strong

interest in maintaining the uniformity of immigration law." Resp. Br. at 35. But

the frequent changes in immigration law provisions, and the corresponding

judicial decisions limiting retroactive application of those provisions, *see, e.g.*,

*Vartelas v. Holder*, 566 U.S. 257 (2012); *St. Cyr*, 533 U.S. 289, demonstrate that, in

many circumstances, the immigration consequences of a conviction can depend

---

[7] We further note that while this Court held in *Morris v. Holder* that *Padilla* did not disturb prior precedent that retroactive deportation is consistent with the Ex Post Facto Clause, we came to that conclusion relying primarily on a Seventh Circuit opinion decided just a few years before *Velasquez-Garcia*. *See Morris v. Holder*, 676 F.3d 309, 317 (2d Cir. 2012), citing *Alvarado-Fonseca v. Holder*, 631 F.3d 385 (7th Cir. 2011); *Lugo*, 783 F.3d at 122. We see no inconsistency in our sister circuit's case law, or between *Morris* and our holding today. The Ex Post Facto Clause has no bearing on Obeya's appeal.

[8] That is particularly so where New York law permitted a petit larceny conviction where a less-than-permanent taking was intended, as discussed *infra*.

16

on when a conviction occurred. "Uniformity," under these circumstances, has hardly been a consistent feature of immigration law.

In any event, the quixotic quest for illusory uniformity, given the BIA's demonstrated willingness to depart from its own precedent, does not outweigh the significant burden posed by deportation. Insofar as the purpose of removal for crimes involving moral turpitude is to deport those noncitizens who have demonstrated a willingness to break certain laws reflecting on their character, it would seem that the government has no compelling interest in removing individuals for crimes that were not considered to reflect so negatively on their character at the time the offenses were committed.

Because the *Lugo* factors weigh heavily in Obeya's favor, we hold that the BIA erred when it retroactively applied the *Diaz-Lizarraga* standard to his removal proceedings. We next consider whether the New York petit larceny statute describes a crime that categorically involves moral turpitude under the old rule; that is, whether the offense requires an intent to deprive the owner of property permanently. It does not.

"A person is guilty of petit larceny when he [or she] steals property." N.Y. Penal Law § 155.25. Stealing property requires an "intent to deprive another of

17

property or to appropriate the same to himself or a third person." *Id.* § 155.05(1).

The deprivation of property under New York law requires doing so

"permanently or for so extended a period or under such circumstances that the

major portion of its economic value or benefit is lost," or "dispos[ing] of the

property in such a manner or under such circumstances as to render it unlikely

that an owner will recover such property." *Id.* § 155.00(3). The appropriation of

property involves the "exercise [of] control over it . . . permanently or for so

extended a period or under such circumstances as to acquire the major portion of

its economic value or benefit," or "dispos[al] of the property for the benefit of

oneself or a third person." *Id.* § 155.00(4).

Under New York law, then, neither the definition of "deprive" nor that of

"appropriate" is limited to a permanent deprivation. Both include deprivation

"for so extended a period of time or under such circumstances" as to destroy or

acquire "the major portion of its economic value or benefit." *Id.* § 155.00(3), (4).

Further, the BIA acknowledged that appropriation of property through

"dispos[al] of the property for the benefit of onself or a third person," *id.*

§ 155.00(4)(b), by its "plain language . . . does not require a showing that a

permanent deprivation or substantial erosion of property rights was intended."

18

*Obeya II*, 26 I. & N. Dec. at 860. The BIA found that that method of appropriation met the new *Diaz-Lizarraga* standard only because the New York Court of Appeals has found that one appropriates property by "'exert[ing] permanent *or virtually permanent* control over the property taken.'" *Id.*, quoting *Medina*, 18 N.Y.3d at 105 (emphasis added). Because a "virtually permanent" deprivation of property must be something less than "permanent" deprivation, it is clear that, whether we look to the plain meaning of the statute or to judicial interpretation, a conviction for petit larceny in New York need not involve an intent to permanently deprive another of property.[9]

Applying the categorical approach, and the BIA's pre-*Diaz-Lizarraga* standard for larceny crimes involving moral turpitude, we find that the BIA erred when it found that Obeya's larceny conviction constituted such a crime. We therefore GRANT Obeya's petition for review and REVERSE the order of the

---

[9] We note that it is an open question whether, when applying the categorical approach, it is appropriate to look to judicial interpretations of statutes to determine the reach of those statutes. *Descamps*, 570 U.S. at 275. Because New York's petit larceny statute does not require an intent of permanent deprivation either on its face or under case law, we continue to reserve judgment on that question.

BIA. The matter is REMANDED to the BIA for further proceedings not

inconsistent with this opinion.