18-834 (L)
Ottey v. Barr

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2019

(Argued:  April 1, 2020          Decided:  July 7, 2020)

Docket Nos. 18-834(L), 19-737(CON)

_____

DWAYNE ANTHONY OTTEY, aka Dwayne Ottey,

*Petitioner*,

- v. -

WILLIAM P. BARR, United States Attorney General,

*Respondent*.

_____

Before:  KEARSE, WALKER, and CABRANES, *Circuit Judges*.

Petitions by Jamaican citizen for review of orders of the Board of

Immigration Appeals (1) dismissing his appeal from an Immigration Judge's

decision that he is a noncitizen who is removable both by reason of being "present

in the United States without being admitted or paroled," 8 U.S.C. § 1182(a)(6)(A)(i), and by reason of having been convicted of "a crime involving moral turpitude," *id*. § 1182(a)(2)(A)(i)(I), to wit, criminal possession of stolen property in the third degree in violation of New York Penal Law § 165.50; and (2) denying his motion to reopen the proceedings. Petitioner contends principally (1) that the Immigration Judge's evidentiary rulings denied him a proper opportunity to prove his procedurally regular admission to the United States, and that the Board misapplied the standard for establishing procedurally regular admission; and (2) that the Board should have granted his motion to reopen on the ground that, in light of intervening case law in *Obeya v. Sessions*, 884 F.3d 442 (2d Cir. 2018), and *Mellouli v. Lynch*, 575 U.S. 798 (2015), criminal possession of stolen property was not a crime involving moral turpitude at the time of his conviction. We conclude that we lack jurisdiction to review the discretionary and factual determinations leading to the removal order, and that petitioner's remaining contentions are without merit.

Petition in No. 18-834 dismissed in part and denied in part; petition in No. 19-737 denied.

> AMER S. AHMED, New York, New York, (Richard W. Mark, Timothy Sun, Gibson Dunn & Crutcher, New York, New York; Sophie Dalsimer, Andrea Saenz,

Brooklyn Defender Services, Brooklyn, New York, on the brief), *for Petitioner*.

DAVID WETMORE, Associate Deputy Attorney General, Washington, D.C. (Joseph H. Hunt, Assistant Attorney General, Greg D. Mack, Leslie McKay, Senior Litigation Counsel, Office of Immigration Litigation, United States Department of Justice, Civil Division, Washington, D.C., on the brief), *for Respondent*.

KEARSE, *Circuit Judge*:

Petitioner Dwayne Anthony Ottey ("Ottey"), a citizen of Jamaica, seeks review of two orders of the Board of Immigration Appeals ("BIA" or "Board"). In No. 18-834, he challenges an order dismissing his appeal from the decision of an Immigration Judge ("IJ") that he is a noncitizen who is removable both by reason of being "present in the United States without being admitted or paroled," 8 U.S.C. § 1182(a)(6)(A)(i), and by reason of having been convicted of "a crime involving moral turpitude," *id*. § 1182(a)(2)(A)(i)(I), to wit, criminal possession of stolen property in the third degree in violation of New York Penal Law § 165.50. He contends principally that the IJ erroneously ruled that he did not establish that he was "admitted" to the United States within the meaning of 8 U.S.C. § 1101(a)(13)(A);

3

that the IJ's evidentiary rulings denied him a proper opportunity to prove he was admitted; and that the IJ erred in denying his motion to reopen the proceeding to present newly discovered evidence on the issue of his admission. In No. 19-737, Ottey contends that the Board erred in denying his motion to reopen the proceeding on the basis of intervening legal authorities that he views as requiring the conclusion that criminal possession of stolen property was not a crime involving moral turpitude at the time of his conviction. For the reasons that follow, we lack jurisdiction to review the discretionary and factual determinations leading to the removal order; we conclude that Ottey's other contentions--that the agency's rulings denied him due process and constituted errors of law--are without merit.

## I. BACKGROUND

Ottey, now some 30 years of age, has lived in the United States since he was brought here from Jamaica at about the age of two. In early 2016, he pleaded guilty to criminal possession of stolen property in the third degree, in violation of New York Penal Law § 165.50; he was sentenced principally to five years' probation.

4

In late 2016, Ottey married the mother of his two children, his longtime girlfriend who is a United States citizen.

In the meantime, in mid-2016, the Department of Homeland Security ("DHS") served Ottey with a notice to appear for removal proceedings, charging him, to the extent relevant here, with being removable (1) as a non-citizen present in the United States without having been admitted or paroled, and (2) as a non-citizen who has been convicted of a crime involving moral turpitude. Ottey, represented by counsel, conceded that he is not lawfully present in the United States; but he moved to terminate the proceeding on the ground that he had in fact been "admitted" to the United States within the meaning of 8 U.S.C. § 1101(a)(13)(A) ("'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer"). Establishing that he had been so admitted--an issue on which he had the burden of proof, *see* 8 U.S.C. § 1361--would render him eligible to seek an adjustment of status through his United States citizen wife, and allow him an opportunity to show that he is deserving of discretionary relief from deportation.

5

A. *Ottey's Evidentiary Proffers in Support of Admission*

In order for an alien to establish that he has been "admitted" to the United States within the meaning of 8 U.S.C. § 1101(a)(13)(A) and seek adjustment of immigration status, he need not show that he complied with the substantive legal requirements for admission but "need only show procedural regularity in h[is] entry." *Matter of Graciela Quilantan*, 25 I. & N. Dec. 285, 287 (BIA 2010) ("*Quilantan*"). An alien satisfies that requirement for procedural regularity if he presented himself for inspection and did not make any fraudulent claim of United States citizenship. *See id*. at 293 ("an alien who physically presents herself for questioning and makes no knowing false claim to citizenship is 'inspected,' even though she volunteers no information and is asked no questions by the immigration authorities"; "such an alien has satisfied the 'inspected and admitted' requirement").

Within this framework, Ottey sought to show that he had been inspected and admitted to the United States in 1991, principally by proffering declarations from his parents, with whom he lived for more than a decade in Brooklyn, New York. However, those declarations state that Ottey was brought to the United States by a third person, not by either his father or his mother.

6

Ottey's father, Mark Ottey ("Ottey Sr."), who stated that he lived in the United States from 1989 until sometime in 2008 (*see* Declaration of Mark Ottey dated November 20, 2016 ("Ottey Sr. Decl."), ¶¶ 2, 8), now lives in Jamaica and provided a sworn declaration stating as follows. Ottey Sr. moved to the United States in 1989 shortly before Ottey was born and began dating a Jamaican woman named "Janet," a permanent resident of the United States who had a son about the same age as Ottey. In 1991, when Janet was planning a trip to Jamaica, Ottey Sr. arranged for her to bring Ottey back to the United States. Accordingly, during her trip to Jamaica, Janet picked up the then-22-month-old Ottey from his mother and took him to the U.S. Embassy where she claimed that she had lost her son's green card. Instructed to provide a photograph of her son, she had Ottey photographed, and she was given a replacement document for her son, bearing Ottey's picture. Janet then entered the United States with Ottey at John F. Kennedy Airport ("JFK"), presenting the document she had obtained from the embassy and passing Ottey off as her son. After arriving, Janet took Ottey to Ottey Sr. in Brooklyn. (*See* Ottey Sr. Decl. ¶¶ 2-4.)

Ottey Sr. stated that he had never actually seen the document issued for Janet's son with Ottey's picture. He said he and Janet had parted ways a few

months after she brought Ottey to the United States, and he does not remember Janet's last name or her son's name. (*See id*. ¶¶ 3, 6.)

Ottey submitted a series of statements from his mother, Pansy Cohen. Cohen stated that she came to the United States about a year after Ottey arrived, and said she had not known in advance about Ottey Sr.'s plan to get Ottey to the United States. She stated that when Ottey was nearly two years old, Janet, who Cohen did not know was dating Ottey Sr., had come to her home in Jamaica on successive days to pick up Ottey, the first day to take him to have his picture taken, and the second--Cohen had believed--to take him to visit Ottey Sr.'s family. But later on the second day, she received a call from Ottey Sr. saying that Ottey was with him in Brooklyn. Cohen said she heard that Janet and Ottey had flown in to JFK.

Cohen's statement as originally submitted was undated and unsigned; it was later resubmitted with date and signature, accompanied by a photocopy of her New York City identification card; and it was thereafter re-signed and submitted with a notarization. The text of all three of these Cohen declarations was identical.

8

These early Cohen declarations were eventually withdrawn by Ottey, following considerable procedural wrangling between himself and DHS. Among other things, in light of Cohen's statements and DHS's inability to verify her identity, DHS sought leave to subpoena Cohen to testify at a hearing. DHS suspected that Cohen herself had entered the United States without being admitted or paroled and that Ottey had entered with her. With Cohen apprehensive about testifying in person because of her immigrant status, when Ottey was unable to secure DHS's assurance that Cohen would not face immigration consequences by testifying, he withdrew those declarations, and DHS withdrew its subpoena request. Thereafter, Ottey presented a fourth Cohen declaration, which provided additional information as to her apprehensions and ongoing obligations, and repeated the statements made in her earlier declarations; Ottey requested that Cohen be allowed to testify only by telephone. DHS then again moved to have Cohen subpoenaed. When the IJ indicated that she would grant DHS's motion, Ottey withdrew Cohen's fourth declaration, and DHS withdrew its subpoena request.

As to Ottey Sr., Ottey sought to have him testify from the U.S. Consulate in Kingston, Jamaica--which would have permitted verification of

Ottey Sr.'s identity. However, that process would have required Ottey to pay a fee of some $1,800 unless the government served a subpoena and requested that the fee be waived; DHS initially agreed to make such a request, but then it refused to do so once Cohen refused to appear at the hearing. Eventually, the IJ agreed to receive testimony from Ottey Sr. by means of his personal telephone.

In the ensuing call--a patchy cellphone communication from the start, which had required two attempts to achieve and maintain connection--Ottey Sr. on direct examination reiterated the substance of his written declaration. He again said he did not remember Janet's last name, and said he had no way to reach her.

On cross-examination, Ottey Sr. said that Cohen had come to Brooklyn to live with him "sometime after [Ottey arrived], either 1992 or 1993" (No. 19-737, Certified Administrative Record ("CAR") 417), and that the family lived together until 2007. However, after DHS began to ask whether Ottey Sr. had not in fact been removed from the United States in 1995, the call was dropped. The IJ's attempt to renew the call with Ottey Sr. failed to achieve a sustainable connection.

DHS opted to proceed without further cross-examination, and the IJ stated that if Ottey Sr. was not available for cross-examination, she would not consider his direct examination. DHS presented evidence that Ottey Sr. had been

10

removed from the United States in 1997 and had reentered in 2001, contradicting his testimony that the family had been together in Brooklyn from 1992 or 1993 until 2007.

The IJ granted a continuance to allow Ottey to obtain additional evidence of his entry into the United States in 1991. She also asked Ottey to provide records of the immunizations that he would have needed to have received in order to begin kindergarten.

In all, there were three evidentiary hearings with regard to Ottey's claim that he had been admitted to the United States. In the first, in March 2017, Ottey had been the only witness. He testified that he first learned that he was not born in the United States around the age of 12, but "wasn't really told how [he] got here" (CAR.355). Ottey had no recollection of arriving as a two-year old, and his parents told him only that he arrived at JFK. The second hearing, in April, was the truncated telephone call with Ottey Sr. At the third hearing, in June, Ottey submitted records of immunizations he received as a young child. DHS argued that although those records dated back to September 1991, they did not demonstrate that Ottey received any vaccinations in the United States before September 1992. As the entries with respect to pre-1992 vaccines appeared to be based on reports by Cohen,

rather than first-hand entries by medical personnel, DHS argued that that fact suggested that Ottey had arrived in the United States in 1992 or 1993 with Cohen and without inspection, rather than having been brought in and inspected, as Ottey Sr. alleged, by Janet.

At the end of the third hearing, when the IJ asked Ottey to specify clearly the evidence on which he was relying to prove the time, place, and manner of his entry, Ottey responded that Ottey Sr.'s testimony was the only available evidence; he argued that the immunization records provided circumstantial corroboration.

B. *The IJ's Decision*

In an oral decision on June 6, 2017, the IJ denied Ottey's motion to terminate the removal proceeding; she granted Ottey a continuance to allow him to pursue any available forms of relief. Thereafter, in addition to applying for withholding of removal and relief under the Convention Against Torture, Ottey moved for reopening and reconsideration of the denial of his termination motion. He argued principally that the IJ should have given full weight to the statements of Ottey Sr. and should permit Cohen to give testimony by telephone. He also stated

12

that on June 7, Cohen informed him that she knows the last name and birth date of Janet, whom Ottey now hoped to find. He moved to subpoena immigration authorities to "produce any and all records pertaining to the entry or arrival of Janet Thompson." (CAR.785.)

In a written final decision dated September 28, 2017 ("IJ Decision" or "Written Decision"), the IJ denied all of Ottey's requests for relief and ordered his removal to Jamaica based on his presence without being admitted and his conviction of a crime involving moral turpitude. As to Ottey's motion to reopen, the IJ rejected his arguments as to the value of testimony by Ottey Sr. and Cohen, and she found that Ottey had not shown that his purported new evidence was not previously available for discovery or for presentation at a prior hearing.

In the Written Decision, the IJ memorialized her June 6 oral decision rejecting Ottey's motion to terminate the removal proceeding, noting, *inter alia*, that the only purportedly direct evidence Ottey had adduced to support his contention that he had been admitted to the United States in a procedurally regular manner was the declaration and direct telephonic testimony of Ottey Sr. The IJ stated that Ottey Sr.'s statements were accorded minimal weight in part because he had become unavailable for cross-examination, and in part because according to his own

13

statement, Ottey Sr. was not present at Ottey's alleged arrival in the United States with Janet. The IJ also found Ottey's immunization records insufficient to show the timing of Ottey's arrival in the United States. She concluded that Ottey had failed to carry his burden of showing that he had been presented for inspection and had been admitted. *See* IJ Decision at 5.

Ottey appealed to the BIA, contending principally that the IJ committed legal error in concluding that Ottey failed to carry his burden of proving a procedurally valid entry to the United States, and that the failure to continue to pursue Ottey Sr.'s telephonic testimony and refusal to allow Cohen to testify by telephone violated his due process rights. In a decision dated March 12, 2018 ("2018 BIA Decision"), the Board dismissed the appeal. It found no clear error in the IJ's factual findings and concluded that Ottey had been provided with "appropriate opportunities to submit evidence and introduce witnesses." 2018 BIA Decision at 3. The BIA also affirmed the denial of Ottey's request for additional time and opportunity to gather more information about the woman who allegedly brought him to the United States. *Id*.

Ottey timely petitioned this Court to review the 2018 BIA Decision. While that petition was pending, Ottey filed motions with the BIA to, *inter alia*,

reopen his removal proceedings on the ground that "intervening" case law in *Obeya*

*v. Sessions*, 884 F.3d 442 (2d Cir. 2018), and *Mellouli v. Lynch*, 575 U.S. 798 (2015),

required the conclusion that possession of stolen property was not a crime involving

moral turpitude at the time of Ottey's conviction. The Board denied the motions.

A petition for review of that denial was filed, and the proceedings for

review were consolidated.

## II. DISCUSSION

In petition No. 18-834, Ottey contends principally that the BIA erred (a)

in rejecting his challenge to the IJ's ruling that he failed to carry his burden of

showing his procedurally regular admission to the United States, (b) in rejecting his

contention that he was denied due process by the IJ's evidentiary rulings

minimizing or curtailing evidence from Ottey Sr. and Cohen to show his

procedurally regular admission, and (c) in denying his motion to reopen the

proceeding to present newly discovered evidence as to the identity of Janet. In

petition No. 19-737, Ottey contends that the Board erred in rejecting his contention

that intervening legal authority requires the conclusion that criminal possession of

15

stolen property was not a crime involving moral turpitude at the time of his conviction.

Where, as here, the BIA approved the IJ's decisions without formally adopting them, we review both decisions "for the sake of completeness," *Wangchuck v. Department of Homeland Security*, 448 F.3d 524, 528 (2d Cir. 2006), to the extent that such decisions are reviewable. For the reasons below, we deny No. 18-834 in part and dismiss it in part for lack of jurisdiction; we deny No. 19-737.

A. *Petition No. 18-834: Challenges to the Inadmissibility Ruling*

Under the Immigration and Nationality Act ("INA") as amended, judicial review of removal "[o]rders against criminal aliens" is limited to consideration of "constitutional claims or questions of law." 8 U.S.C. §§ 1252(a)(2)(C)-(D). Regardless of the rhetoric and labels used in the petition for review, a challenge that "merely quarrels over the correctness of the factual findings or justification for the discretionary choices" is not reviewable. *Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 329 (2d Cir. 2006).

Only one of Ottey's contentions--the claim that he was denied a fair opportunity to prove his procedurally-regular-entry defense--at all implicates

16

constitutional principles. But that contention is squarely belied by the record. As described in Part I.A. above, Ottey had several evidentiary hearings before the IJ, with repeated continuances and other indulgences to permit him to determine whether there was additional evidence he wished to present. For example, although agency policy disfavors receipt of testimony by cellular telephone, the IJ agreed to hear Ottey Sr. through his cell phone in light of the high fee for having such a call made at the consulate, Ottey's indigence, and his representation by a public interest organization with limited resources (*see* CAR.399). That procedure was begun only after some difficulty in achieving a connection, was continued until the connection was broken early in the course of cross-examination, and was attempted anew in vain. (*See* CAR.435 ("[IJ:] .... We tried multiple times to call him. He wasn't available.").)

The IJ stated that Ottey Sr.'s testimony would be accorded minimal weight because he had become unavailable for cross-examination. But she proceeded to consider that testimony and Ottey Sr.'s written statements--which were not materially different from his uncross-examined testimony. The IJ discounted Ottey Sr.'s statements as to the manner of Ottey's actual entry to the United States not only because DHS had been unable to cross-examine him, but also

17

because he had no first-hand knowledge as to whether Ottey was presented for inspection. By his own admission, Ottey Sr. had neither seen the immigration document he described, bearing the name of Janet's son but the picture of Ottey, nor been present at the airport at which Ottey allegedly entered the United States. According minimal weight to such evidence does not implicate constitutional principles.

We likewise see no merit in the contention that Ottey was denied due process with respect to testimony from Cohen. Ottey submitted--and withdrew--a total of four declarations from her, each of which included her statement as to how Ottey was taken to the United States. He has pointed to no constitutional principle that required the IJ, at Ottey's request, to adopt a procedure that could reduce DHS's opportunity to conduct effective cross-examination--and would diminish the IJ's opportunity to observe Cohen's demeanor in order to assess her credibility. In any event, it was Ottey's own choice to withdraw all of those declarations rather than to have Cohen appear at a hearing.

Nor has Ottey pointed to any way in which the absence of testimony from Cohen caused him prejudice. Cohen was in no position to present competent evidence that Ottey entered the United States at JFK and was presented for

inspection. Her declarations stated unequivocally that she had no advance knowledge of Ottey Sr.'s plan to have Janet bring Ottey to the United States; she merely stated that she had "heard"--likely via hearsay from Ottey Sr.--that Janet and Ottey arrived at JFK. No aspect of anything Cohen said--or could say--about Ottey's alleged entry to the United States with Janet was based on Cohen's personal knowledge.

Ottey also contends that the agency erred as a matter of law in failing to conclude that Ottey Sr.'s declaration and telephonic testimony--with or without Ottey's hospital and immunization records--were sufficient to show that Ottey's entry to the United States was procedurally regular under the standard established in *Quilantan*. But neither that contention nor the contention that the IJ erred in according minimal weight to the sworn statements of Ottey Sr. raises issues of law. While we have jurisdiction to review such legal questions as which party bears the burden of proof and what considerations are permissible or impermissible, "[t]he amount of weight to be accorded any particular fact raises no question of law and is accordingly not within this Court's jurisdiction," *Boluk v. Holder*, 642 F.3d 297, 304 (2d Cir. 2011); *see id*. ("we do not reevaluate the relative strength of the evidence presented to the immigration judge" (internal quotation marks omitted)). A

19

petitioner's "assert[ion] that he met his burden of proof" under the legal standard applied "constitutes a mere[] quarrel[] over the correctness of the factual findings." *Barco-Sandoval v. Gonzales*, 516 F.3d 35, 42 (2d Cir. 2008) (internal quotation marks omitted); *see id*. at 39 ("we remain deprived of jurisdiction to review decisions under the INA when the petition for review essentially disputes the correctness of an IJ's factfinding" (internal quotation marks omitted)).

In *Quilantan*, the BIA concluded that a procedurally regular entry had been sufficiently established by testimony of the alien herself that she had been waved through the port of entry without being asked any questions. *See* 25 I. & N. Dec. at 293. There is no such factual predicate here. Ottey--the only witness who was present at his alleged entry with Janet--acknowledged that he could not testify about his entry because he had been a toddler and had no recollection. Ottey's father and mother were not present for his alleged entry with Janet. Neither *Quilantan* nor any principle of law required the IJ to give credence--much less to give conclusive weight--to their hearsay, or double hearsay, evidence. We lack jurisdiction to review the IJ's factual determinations or the weight given to the various declarations.

20

Similarly, Ottey's final motion, seeking additional time to conduct a search for Janet after his mother disclosed to him--some 10 months into the removal proceeding--that she knew Janet's last name and birth date, was denied on the ground that Ottey had not shown that this purported new evidence was not previously available for discovery or for presentation at a prior hearing. Whether that final motion is construed as a motion for a continuance in the ongoing removal proceeding or as a motion to reopen the denial of the termination-motion phase of the proceeding, Ottey has not raised any legal challenge to its denial. And if we had jurisdiction to review it, we would surely find no abuse of discretion.

In sum, we deny so much of Petition No. 18-834 as contends that Ottey was denied due process; we dismiss the remainder of that petition for lack of jurisdiction.

B. *No. 19-737: Crimes Involving Moral Turpitude*

Ottey's challenge in No. 19-737 to the Board's denial of his motion to reopen makes the legal argument that at the time of his conviction, criminal possession of stolen property was not a crime involving moral turpitude. We see no error.

21

The INA provides, with exceptions not relevant here, that certain aliens are ineligible for visas or admission into the United States, including

> any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of--
> > (I) *a crime involving moral turpitude* . . . .

8 U.S.C. § 1182(a)(2)(A)(i)(I) (emphasis added).

The INA does not define the term "moral turpitude." The BIA interprets that term to focus not on the seriousness of the offense or the severity with which it is punishable, but rather on "'the offender's evil intent or corruption of the mind.'" *Mendez v. Mukasey*, 547 F.3d 345, 347 (2d Cir. 2008) ("*Mendez*") (*quoting Matter of Serna*, 20 I. & N. Dec. 579, 581 (BIA 1992)). "We afford *Chevron* deference to the BIA's interpretation of th[at] undefined statutory term," *Mendez*, 547 F.3d at 346, and we conduct *de novo* review of the BIA's determination that a particular state crime is one involving moral turpitude, as that term is thus interpreted, *see id.* at 346-47.

1. *Criminal Possession of Stolen Property*

In considering whether a conviction is for a crime involving moral turpitude, the agency and the courts apply a "categorical approach," under which the focus is "on the intrinsic nature of the offense rather than on the factual circumstances surrounding any particular violation." *Gill v. INS*, 420 F.3d 82, 89 (2d Cir. 2005) (internal quotation marks omitted). Thus, "we look only to the minimum criminal conduct necessary to satisfy the essential elements of the crime, not the particular circumstances of the defendant's conduct." *Mendez*, 547 F.3d at 348.

Under New York law, a person is guilty of criminal possession of stolen property in the third degree if he

> knowingly possesses stolen property, with the intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof, and when the value of the property exceeds three thousand dollars.

N.Y. Penal Law § 165.50. In *Michel v. INS*, 206 F.3d 253 (2d Cir. 2000) ("*Michel*"), with regard to a removal order under 8 U.S.C. § 1227(a)(2)(A)(ii) for an alien who had been convicted of "two or more crimes involving moral turpitude," we considered the New York crime of fifth-degree criminal possession of stolen property. That

23

crime is committed, without regard to the value of the stolen property, by a person who

> knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof,

New York Penal Law § 165.40. We concluded that fifth-degree criminal possession of stolen property constitutes a crime involving moral turpitude because "knowledge is a requisite element of [§] 165.40 and corrupt scienter is the touchstone of moral turpitude." *Michel*, 206 F.3d at 263.

The substance of fifth-degree criminal possession of stolen property is identical to that of third-degree criminal possession of stolen property, with the latter adding only a value element--that the property be worth at least $3,000. Given that both of these New York statutory sections require the same degree of mental culpability, and that in *Michel* we determined that fifth-degree criminal possession of stolen property with no property value minimum is a crime involving moral turpitude, *a fortiori* third-degree criminal possession of stolen property requiring the identical *mens rea*--but requiring that the property be worth at least $3,000--is a crime involving moral turpitude.

## 2. *Ottey's Proffer of "Intervening" Authority*

Ottey contends that the Board should have granted his motion to reopen the proceedings on the ground that "intervening" decisions in *Obeya v. Sessions*, 884 F.3d 442 (2d Cir. 2018) ("*Obeya*"), and *Mellouli v. Lynch*, 575 U.S. 798 (2015), require the conclusion that possession of stolen property was not a crime involving moral turpitude at the time of his conviction. We disagree.

We do not see that *Obeya* has any bearing on the nature of the crime of possession of stolen property. *Obeya* involved a crime of larceny. Until 2016, the BIA had held that "larceny constitutes a [crime involving moral turpitude] only when a permanent taking is intended." *Obeya*, 884 F.3d at 444 (internal quotation marks and emphasis omitted). In 2016, however, the Board decided that a larceny crime should also be considered to involve moral turpitude "under circumstances where the owner's property rights are substantially eroded." *Matter of Diaz-Lizarraga*, 26 I. & N. Dec. 847, 854 (BIA 2016) ("*Diaz-Lizarraga*"). Given that "*Diaz-Lizarraga* expressly effected a clear departure from longstanding BIA precedent," *Obeya*, 884 F.3d at 448--and that in "conducting retroactivity analysis in the immigration context, we look to *whether it would have been reasonable for a criminal defendant to rely on the immigration rules in effect at the time that he or she entered a guilty*

25

*plea*," *id*. (emphasis added)--we held that the rule of *Diaz-Lizarraga* could not be applied retroactively to larceny crimes that had been committed prior to that decision.

The decision in *Diaz-Lizarraga* did not deal with offenses of possession of stolen property; the BIA viewed receipt of stolen property as "a distinct and separate offense" from theft, *Matter of Cardiel-Guerrero*, 25 I. & N. Dec. 12, 14 (BIA 2009). The BIA had long held that criminal possession of stolen property is a crime involving moral turpitude, *see, e.g.*, *Matter of Salvail*, 17 I. & N. Dec. 19 (BIA 1979); and we had affirmed that principle in *Michel*, *see* 206 F.3d at 262-265. Nothing in *Diaz-Lizarraga* indicated any change in the BIA's view of criminal possession of stolen property; and nothing in *Obeya*'s ruling--that *Diaz-Lizarraga* could not be applied retroactively to crimes of larceny--affected either the BIA's consistent view of criminal possession of stolen property as a crime involving moral turpitude or *Michel*'s affirmance of that view. The state of the law when Ottey pleaded guilty could not have given Ottey reason to believe that the BIA would treat his possession crime other than as a crime involving moral turpitude within the meaning of 8 U.S.C. § 1182(a)(2)(A)(i)(I).

Nor was the Board required to grant Ottey's motion to reopen based on his invocation of the Supreme Court's decision in *Mellouli*. *Mellouli* did not address either property crimes or crimes involving moral turpitude. It dealt with an interplay between state and federal laws governing narcotics trafficking, and it expressed concern that a lesser drug offense resulted in harsher immigration consequences than would more serious drug offenses. Although Ottey seeks relief through *Mellouli* because he views criminal possession of stolen property as a less serious crime than larceny, as discussed in Part II.B.1. above the concept of moral turpitude focuses neither on the seriousness of the offense nor on the severity with which it is punishable. Rather, the focus is on whether the offender had an "'evil'" or "'corrupt[]'" state of mind. *Mendez*, 547 F.3d at 347 (*quoting Matter of Serna*, 20 I. & N. Dec. at 581).

Further, *Mellouli* was not an "intervening" decision; it was decided in 2015, the year before Ottey pleaded guilty to criminal possession of stolen property. Any argument that the underlying concern expressed in *Mellouli* prevents Ottey's crime from being considered a crime involving moral turpitude could have been raised during his removal proceeding before the IJ.

We conclude that there was no error in the BIA's rejection of Ottey's motion to reopen the removal proceedings based on his claim of an intervening change in the law.

## CONCLUSION

Ottey also argues that because the Notice to Appear served on him in August 2016 did not specify the time and place for his hearing, it deprived the BIA of jurisdiction over his removal proceedings. This argument is foreclosed by our decision in *Banegas Gomez v. Barr*, 922 F.3d 101, 112 (2d Cir. 2019). Ottey so acknowledges, and states that he has made the argument here simply to preserve it for further appeal.

We have considered all of Ottey's arguments that are properly before us and have found them to be without merit. For the reasons stated above, the petition in No. 18-834 is denied in part, and is dismissed in part for lack of jurisdiction; the petition in No. 19-737 is denied.